[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 23 
Defendant Don Edwin Adkins appeals from the trial court's denial of his motion for a new trial. Defendants Frank Madison, Max Brasher, and City of Winfield filed a separate appeal from the trial court's denial of their motions for new trial.
These appeals arise from a personal injury action brought by the minor plaintiff and his mother. That action was tried to a jury, which returned a general verdict against all defendants for $180,000 compensatory damages and $40,000 punitive damages. We reverse and remand on the refusal of the trial court to grant the motions for a new trial for Madison, Brasher, and the City of Winfield. We affirm the trial court's denial of Adkins's motion for a new trial.
Although several issues are argued in the briefs, the dispositive issue for review with respect to appellants Madison, Brasher, and the City of Winfield is whether the trial court erred in failing to give these appellants' requested charges to the jury.
The issues raised by appellant Adkins are:
(1) Whether the trial court erred in denying a continuance due to Adkins's absence;
(2) Whether the trial court erred in issuing an attachment for Adkins based upon a subpoena which was executed by a co-defendant;
(3) Whether the trial court erred in making certain remarks during the trial;
(4) Whether the trial court complied with Rule 51, A.R.Civ.P., which requires the attorneys to be notified, prior to closing arguments, as to which legal theories will go to the jury;
(5) Whether the trial court erred in allowing a juror to consult with the partner of an attorney representing a co-defendant in the case; and
(6) Whether the trial court erred by denying Adkins's motion for a new trial based upon the alleged errors set out above.
Plaintiff Scott Weldon was injured when defendant Don Edwin Adkins drove his car into the truck in which Scott was a passenger. Scott, a minor, brought suit through his mother, Myrtle Weldon, as next friend, and Mrs. Weldon joined in the action in her own behalf. The Weldons filed suit against Adkins and two police officers of the City of Winfield. The officers, Max Brasher and Frank Madison, had been involved in a high speed chase with Adkins for about fifteen minutes prior to the accident. The Weldons later amended their complaint to include the City of Winfield as a party defendant, alleging that the combined negligent and wanton acts of defendants proximately caused injury to the plaintiffs. Scott requested compensatory damages for personal injury and punitive damages. Mrs. Weldon requested compensatory damages for Scott's medical expenses and the loss of his services, as well as punitive damages.
At the time of the pursuit, Officers Brasher and Madison were in separate police cars. Madison was the first to observe Adkins travelling toward Jasper on Highway 78 at 74 miles per hour in a 50 mile per hour zone within the city limits of Winfield. Officer Brasher then spotted Adkins travelling at 100 miles per hour, still within the Winfield city limits. Brasher turned on his blue light and siren and began to pursue *Page 24 
Adkins. Before Madison turned around to follow Adkins, he heard Brasher say over the police radio that he was in hot pursuit of a speeding car on Highway 78 moving toward Jasper. Madison then turned on his blue light and turned around to pursue Adkins.
Brasher continued to pursue Adkins toward Jasper on Highway 78 at speeds approaching 100 miles per hour. The chase continued through several intersections and turns over several different stretches of road, including a two-lane farm-to-market residential road; Brasher remained in contact with the Winfield base station on his police radio to keep the base informed of his location. Brasher at one point pulled alongside Adkins's vehicle, and he testified that Adkins appeared to be intoxicated. Adkins lost control of his car on the Dogtown Cutoff Road, but regained control and continued his attempt to elude the police.
The pursuit ended when Adkins ran a stop sign and collided with the truck in which Scott Weldon was riding. Adkins later admitted at his deposition that at the time of the wreck he had drunk five or six beers. He also testified that he was speeding when he saw the two officers and that he "took off," hoping he could lose them. In spite of the blue light flashing and the officer's gestures to Adkins to pull over, he continued driving "wide open" to get away. He stated that he did not put on brakes at the intersection where he hit the truck in which Scott Weldon was riding.
The trial court submitted to the jury the counts of negligence and wantonness against all defendants. The jury returned a general verdict against all defendants for compensatory and punitive damages.
 The Madison, Brasher, and City of Winfield Appeal
Defendants Madison, Brasher, and City of Winfield contend that the trial court erred in refusing the following written requested charges:
 "14. The court charges the jury that speed limitations as provided for under the laws of the State of Alabama do not apply to vehicles operated with due regard for safety and under the direction of police officers of the law in the case of apprehension of violators of the law or of persons charged with or suspected of any such violation.
 "The court further charges the jury that in determining whether the police officers Max Brasher and Frank Madison, or either of them, acted negligently or were guilty of wanton conduct on the occasion complained about, you are to consider that they and each of them were charged with the duty of arresting law violators and if you are reasonably satisfied from the evidence that the defendant Adkins was on the occasion complained about a law violator and was committing violation of the speed laws of the State of Alabama in the presence of the officers, then you are to also consider that the police officers must and often have to exceed the speed limits of the laws of the State of Alabama and exceed precautions normally imposed upon other individuals and further that under such conditions the police officers were not obliged to allow the defendant Adkins to escape, even though pursuit may contribute to defendant Adkins's reckless driving while being pursued."
 "15. The court charges the jury that if in the presence of the police officers on the occasion complained about the defendant Adkins violated the speed laws of the State of Alabama, it was the police officers' duty to take steps to suppress the offense and apprehend the defendant Adkins.
 "The law imposes upon the City of Winfield and the police officers Brasher and Madison duties which they must perform; in the performance of these duties, the City of Winfield and the police officers must take actions which an individual is not ordinarily called upon to take, such as exposure to the dangers of traffic, and therefore the standard of care exercised by the police officers must be judged more liberally." *Page 25 
 "17. The court charges the jury that police officers have a duty to pursue and attempt to apprehend speed law violators and in doing so may drive at such speeds and take such steps as may be necessary to apprehend the violator so long as an officer does not exceed proper and rational bounds or act in a negligent or wanton manner and if you are
 reasonably satisfied from the evidence in this case that the defendant Adkins was violating the speed laws of the State of Alabama on the occasion complained of, then the court charges the jury the police officers involved had a duty to pursue him and drive at such speeds and take such steps as were necessary to apprehend the defendant Adkins, so long as the officers did not exceed proper and rational bounds nor act in a negligent or wanton manner. If you are further reasonably satisfied from the evidence that the officers did not exceed proper and rational bounds on the occasion complained about, nor acted in a negligent and wanton manner as directed by the court, then you cannot return a verdict for the plaintiffs and against the defendants City of Winfield, Max Brasher and Frank Madison for such actions or conduct on the part of Max Brasher and Frank Madison.
 "The court further charges the jury that the police officers, while in pursuit of the defendant Adkins, were entitled to have any negligent conduct on their part directed by a standard of care different from that normally imposed upon individuals, giving due regard to the type of duty they are required to perform in the public interest in that they should not be held responsible for the action of the defendant Adkins although the pursuit may have contributed to his driving recklessly since the officers were not obliged to allow him to escape."
 "21. The Court further charges the jury that if you are reasonably satisfied from the evidence that the defendant, Adkins violated the speed laws of the State of Alabama, in Marion County, Alabama, which was the county of the police officers, Brasher and Madison, and that the speeding offense was committed in said officers' presence, then the Court charges the jury that said police Adkins in Walker County, Alabama."
As we explain later in this opinion, the trial court was unable to inform defendants of its rulings on their written requested charges prior to their arguments to the jury because defendants submitted to the court a large number of requested charges at a time later than that requested by the court. Defendants objected to the trial court's refusal to rule on the written requested charges, and the court informed the parties that they could object to the oral charge after it had been given to the jury. Following the oral charge, these defendants excepted to the court's failure to submit to the jury the legal principles encompassed in charges 14, 15, 17, 21, supra, and others. Defendants stated these principles in their objection and also referred to the requested charges by number. Therefore, these defendants properly preserved the alleged error for review. See Rule 51, A.R.Civ.P.
Defendants submitted the above charges for the purpose of having the court instruct the jury that the officers had the duty and responsibility to enforce the law, and that, accordingly, they should be judged by a more liberal standard of care. Additionally, defendants offered an instruction that the officers were not liable for the conduct of defendant Adkins, even though the pursuit might have contributed to his reckless driving. Because of extensive testimony about the chase being conducted across county lines, defendants also sought to have the court instruct the jury that the officers had the authority to arrest Adkins in Walker County.
We hold that the trial court committed prejudicial error in refusing to charge the jury on the law as reflected in charges 17 and 21 (charge 17 repeats substantially all of the legal principles contained in charges 14 and 15). *Page 26 
The trial court correctly, but incompletely, charged the jury:
 "Remember that negligence is doing something that a reasonably prudent person would not have done under the same or similar circumstances, or failing to do something that a reasonably prudent person would have done under the same or similar circumstances.
 "Now, when applying this measure to these defendants, and in particular, these police officers, we are talking about what a reasonably prudent police officer would have done under the same or similar circumstances. And we are talking about what a reasonably prudent police officer would not have done under the same or similar circumstances.
 "Now, in determining . . . what a reasonably prudent police officer would have done under the same or similar circumstances, you may take into consideration the generally accepted standards and practices which you have heard about and which were applicable to police in similar situations at that time.
"Let me see if I can untangle that.
 "In determining whether or not these defendants, especially the police officers, were wanton or negligent, you must look at what would a reasonably prudent police officer have done under the same or similar circumstances, or what would he not have done? Did he do something that he ought not to have done?
 "And in making this decision, you may use the generally accepted standards, adopted and in practice and used by police officers similarly situated at the time that this transaction took place."
The error in this instruction lies in the court's failure to clearly distinguish between the standard of care to be applied for the officers' own personal acts and the standard of care of the officers for their official acts in pursuing a law violator.
This Court recognizes that there are no Alabama decisions which directly address this question which was before the trial court. The only prior Alabama decision concerning the duty of care of a police officer performing his duty is Swift Co. v.Payne, 223 Ala. 25, 134 So. 626 (1931). In Swift, a motorcycle policeman on his way home for dinner collided with another vehicle. In dicta, this Court stated:
 "[T]he rights and duties of the parties to this accident — by parties in this connection we mean plaintiff and the driver of defendant's truck — were just what they would have been had plaintiff not been an officer of the law; that is to say, plaintiff was not performing any official duty requiring unusual speed nor was he relieved of any duty of due care which would have rested upon a private citizen in the same situation." 223 Ala. at 26, 134 So. at 627.
Nevertheless, Swift implies that the duty of care for a policeman performing an official duty requiring unusual speed is different from that of a private citizen.
A statute in effect at the time of this collision, September 23, 1978, exempted law enforcement officers from statutory speed limitations in certain situations. Code of 1975, §32-5-96, provides:
 "The speed limitations as set forth in this article shall not apply to vehicles when operated with due regard for safety and under the direction of state troopers, police or road or other officers of the law, as herein provided, in the case of apprehension of violators of the law or of persons charged with or suspected of any such violation, nor to fire departments or fire patrol vehicles when traveling in response to a fire alarm, nor to public or private ambulances when traveling in emergencies. The exemption shall not however protect the driver of any such vehicles or his principal from the consequences of a reckless disregard of the safety of others, as provided by law." (Repealed effective May 19, 1980).
Therefore, a police officer could exceed the speed limit so long as he did not drive in reckless disregard of the safety of others. Neither the statute nor Swift addresses the question of the police officer's responsibility for the behavior of the pursued, however, *Page 27 
because both focus on the officer as driver.
Cases from other jurisdictions, however, are persuasive on that point. The question presented in Wrubel v. State,11 Misc.2d 878, 879, 174 N.Y.S.2d 687, 689 (N.Y.Ct.Cl. 1958), was almost identical to the one at issue in the case at bar: "Is the State liable for damage occasioned by a fleeing lawbreaker while being pursued by a state trooper who was performing his duty?" The Wrubel court held that the State was not liable under the circumstances of that case.
The facts themselves in Wrubel and those in the present case are quite similar. The state trooper in Wrubel observed a speeding automobile and gave chase with siren blowing and red lights flashing. Five times the officer pulled abreast of the automobile to signal the motorist over, but each time the driver swerved toward the trooper's car to force him back. The automobile, while being pursued, collided with another automobile, causing injuries to the driver and passenger. The Court found that the State was not liable, because the proximate cause of the wreck was the speed of the pursued automobile and not the conduct of the trooper. The Court expressed concern that if it held the State liable in such circumstances police officers might be reluctant to act in an emergency, with the consequences that the community could be stripped of proper and adequate protection against malefactors.
The following analysis in Wrubel is especially significant:
 "In the presence of a violation of law it is the officer's duty to take steps to suppress the offense and apprehend the offender. At its inception the offense being committed was only a traffic infraction. However, it developed, in the opinion of the Court, into reckless driving, a misdemeanor, also into resisting an officer, and other crimes which could be made out of the incident as it developed.
 "Claimants' predication of liability on the State is founded on the novel position that the trooper, in attempting to halt one increasing the danger on the highway, did by his attempt alone increase the danger himself. To extend this position to the ultimate would require a police officer to pursue, at an otherwise lawful rate of speed, a lawbreaker traveling at an unlawful rate of speed, or to ignore him in the first place.
 "An operator who is speeding, or who is a reckless driver on the highway, would know that all he had to do was to go faster — and under claimants' theory escape would be possible — there would be no chase. A burglar, bank robber or any other felon could threaten to shoot and under claimants' theory escape would be possible and arrest avoided. It is fantastic to further expand claimants' theory — such thinking would place a police officer in the same category as the Marquis of Queensbury in a pier six brawl.
 "In so holding we do not say that it is impossible for an officer to be negligent or reckless in the performance of his duties. That it is possible is amply pointed out by some of the cases cited by claimants. However, we do not feel those cases to be applicable or controlling in the present instance.
 "A police officer has a right to use whatever means necessary to make an arrest and unless he exceeds proper and rational bounds or acts in a negligent, careless or wanton manner, he is not liable for damages sustained, even by innocent parties, under the circumstances that arose herein. We think the action of the trooper was proper. The contention of claimants is unsound." 11 Misc.2d at 879-80, 174 N.Y.S.2d at 689.
Florida has followed the Wrubel analysis in finding that a city is not liable for the wrongful death of a third person killed by one attempting to escape the police in the absence of evidence of lack of due care in operation of the police officer's automobile, City of Miami v. Horne, 198 So.2d 10
(Fla. 1967). In Horne, at 13, the court, citing Wrubel, set out the following standard of care: *Page 28 
 "The rule governing the conduct of [a] police [officer] in pursuit of an escaping offender is that he must operate his car with due care and, in doing so, he is not responsible for the acts of the offender. Although pursuit may contribute to the reckless driving of the pursued, the officer is not obliged to allow him to escape."
Based upon the preceding authorities, it was error for the trial court to refuse to give requested charge 17. Additionally, under the authority of Raughley v. State,398 So.2d 414 (Ala.Cr.App. 1981), the jury should have been instructed that the officers had the authority to arrest Adkins in Walker County. Therefore, it was also error to refuse to give requested charge 21. Because the trial court failed to properly instruct the jury, these defendants were prejudiced and, therefore, their motions for a new trial should have been granted.
 The Adkins Appeal
The first issue for review concerning Adkins is whether the trial court erred in refusing to continue the case due to Adkins's absence at trial. Adkins alleges that the court forced his attorney to try the case without allowing any opportunity to procure Adkins's attendance.
The record shows that the case was continued twice, and that on three occasions when the case was set for trial Adkins was absent. When the case was set for September 20, 1982, the trial court informed the parties that if Adkins failed to appear before the court at that time no more continuances would be granted.
The grant or denial of a motion for a continuance is discretionary with the trial court and will not be reversed unless gross abuse of discretion is shown. Perdue v. Mitchell,373 So.2d 650, 652 (Ala. 1979). Adkins has not shown this Court that the trial court abused its discretion in this case. Accordingly, the trial court will not be reversed for denying his motion for a continuance.
Adkins's next contention of error is that the court issued an attachment for him based upon a subpoena issued August 10, 1982, which was executed by C.P. Lyons and J. Max Brasher, a co-defendant in the case. Rule 45 (c), A.R.Civ.P., prohibits a party to an action from serving a subpoena in that action.
The record affirmatively shows that on July 7, 1982, Adkins was served with the same subpoena informing him of the September 20, 1982, trial date. That subpoena was executed by one Ingram and one Purser, neither of whom were parties to the case. The record also discloses another subpoena informing Adkins of the June 3, 1982, trial date issued on May 28, 1982, and executed by one Tice on June 1, 1982. Any error, therefore, in the service of the subpoena issued August 10, 1982, and served by Brasher and Lyons on August 25, 1982, was not prejudicial to Adkins, because Adkins had been notified of the trial dates numerous times by other duplicative subpoenas.
Adkins claims that the trial court erred in making certain statements in front of the jury.[1] A review of the record and the context in which the statements complained about were made shows that those statements were not comments on the evidence and were not prejudicial. The observations in question were made to counsel and were either expressive of the reason *Page 29 
for the court's ruling on objections by counsel or for the purpose of directing the line of questioning away from topics which would not help the jury to decide the case. See Buzzancav. Hagwood, 265 Ala. 404, 91 So.2d 703 (1956) (court's comments were not comments on the evidence). Additionally, the court instructed the jury as follows at the beginning of the case: "Likewise, statements made by the Court are not evidence in the case either, and are not to be so considered by you." Again, during the oral charge, the court instructed: "Likewise, statements made by the Court are not evidence in the case either and should not be considered by you."
First, those statements were not prejudicial, and the court committed no error for which we should reverse. Second, the court instructed the jury to disregard its comments. Therefore, Adkins's contention that the trial court usurped the function of the jury to determine the credibility of the evidence is without merit.
Adkins alleges that the trial court failed to comply with Rule 51, A.R.Civ.P., which states:
 "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file and, in such event, shall serve on all opposing parties written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed."
The record shows that the court told the parties, prior to closing arguments: "Gentlemen, I would be inclined to let both counts of negligence and wantonness go to the jury." Therefore, counsel were generally informed that the court would instruct the jury on wantonness and negligence. The rule "is designed to afford counsel an opportunity to know in advance of the argument, the guiding principles under which the argument should be made." Dallas Railway Terminal Co. v. Sullivan,108 F.2d 581, 583 (5th Cir. 1940).
Furthermore, the trial court stated:
 "Gentlemen, I'm sorry. Let the record show that I requested counsel on Friday or Thursday to get me the written charges so that I would have an opportunity to go over them and that counsel has favored the Court this morning after nine o'clock with about a hundred and fifty some odd written charges, requested charges, and that I just don't have time to look at all of those charges and I wish I did, but that the Court will look at those charges and try to cover everything that is requested that is felt material and pertinent to this case. And then, if I don't, I will give counsel the chance to call that to my attention after I have finished my oral charge and I will — but as far as having an opportunity of reading the charges before the argument, I haven't been able to do that."
The trial court's reference to charges pertains to those requested by Madison, Brasher, and the City of Winfield. Adkins, apparently relying on his co-defendants, did not request any charges of his own.
The trial court, in accord with Rule 51, asked the parties to submit their requests in time for him to read them. Therefore, it is Adkins, and not the trial court, who failed to comply with Rule 51. The trial court did not commit error on this point.
The next allegation of error which Adkins makes is that Jimmy Dickerson, a juror, was allowed to consult with Mr. Tweedy, a partner of Harvey Jackson, the attorney representing Adkins's co-defendants in the case. The jury returned the same verdict against Mr. Jackson's clients as against Adkins; therefore, it is impossible to conclude from the record that the consultation had any prejudicial effect on the jury against Adkins. Additionally, the record shows that the attorney for the Weldons and an attorney for the City of Winfield had notes reflecting that Dickerson had responded on voir dire that he was represented by Mr. Tweedy in a land transaction. Yet, none of the parties moved to *Page 30 
strike Mr. Dickerson from the jury. Accordingly, we cannot conclude that the trial court committed any reversible error in allowing Dickerson to consult with Tweedy during the trial.
For all of the reasons discussed previously, the trial court did not commit any error which would require a new trial for Adkins, and, accordingly, the court properly denied Adkins's motion for a new trial.
The next issue before us is whether it is proper to allow the verdict to stand against Adkins alone, when the other defendants' motions for new trial must be granted.
Rule 59, A.R.Civ.P., states in part: "A new trial may be granted to all or any of the parties. . . ." (Emphasis added.)
This Court addressed the issue of partial new trials in Youngv. Woodward Iron Co., 216 Ala. 330, 335, 113 So. 223, 228-29
(on rehearing) (1927). In that case, the Court stated:
 "At common law a judgment against two or more defendants jointly was regarded as an entirety, so that a reversal of the judgment as to one defendant required a reversal as to all. This rule, founded chiefly upon technical considerations, and now generally disfavored by the courts has been recognized as existing in this state. [Citations omitted.]
 "In later cases, while the general rule is not defined, exceptions have been recognized, and the force of the old rule is now materially weakened. North Alabama Traction Co. et al. v. Hays, 184 Ala. 592, 64 So. 39; Southern R. Co. et al. v. Harris, 207 Ala. 534, 93 So. 470.
 "As noted in the text of 2 Ruling Case Law, 268, § 220:
 "`The tendency of modern decisions is, however, to modify the strictness of the common-law rule to the extent of holding that a judgment, though joint in form, is not necessarily entire, and that, where it is several in effect, and the adjudication as to one cannot affect the rights of the others, such judgment may be reversed as to some and affirmed as to others.'"
The majority of decisions following the rationale of Young, and allowing a new trial for some defendants and not others, concerns defendants who received jury verdicts in their favor and whose interests would not be affected by a partial new trial. See, e.g., Trimble v. Bramco Products, Inc.,351 So.2d 1357 (Ala. 1977); Harnischfeger Corp. v. Harris, 280 Ala. 93,190 So.2d 286 (1966). On the other hand, the decisions in which this Court has held that the entire case must be remanded for a new trial deal with co-defendants whose interests are closely related. See, e.g., Lloyd Wood Construction Co., v. Con-Serv.,Inc., 285 Ala. 409, 232 So.2d 649 (1970) (defendants were principal and surety on a bond); Toranto v. Hathaway, 219 Ala. 520,122 So. 816 (1929) (defendants were master and servant).
In the case at bar, the adjudication of the interests of defendants Madison, Brasher, and City of Winfield would have no effect on the interest of Adkins. Therefore, the verdict and judgment as they relate to Adkins will stand, because the trial court committed no error with respect to him.
Because of the errors discussed above, the judgment as it relates to Madison, Brasher, and the City of Winfield must be reversed, and the cause remanded. Because Adkins failed to show any errors committed against him, the judgment denying his motion for a new trial is affirmed. It is so ordered.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.
[1] The prejudicial error claimed by Adkins is based upon statements made by the trial court. Because many of the statements were repetitious, a partial list follows:
"That's enough. I think that is good enough."
"Gentlemen, I'm not sure that that's going to help us in this case.
"I'm not sure that would help us in this case, what training he had received in 1951 wherever he received it."
"So, in considering the evidence in this case, apply your own everyday experiences in life and your own common sense. And in that respect, cut through all of the red tape or whatever — the confusion and so on, and read between the lines, so to speak, and get to the truth in the matter. . . ." *Page 31